# EXHIBIT 2

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Case Number: 01-23-0000-7133

Christopher Klug            "Claimant"
-vs-
BurgherGray LLP            "Respondent"

### FINAL AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated August 17, 2020, and having been duly sworn, and having duly heard the proofs and allegations of the Claimant, represented by Gregory L. Ewing, Esq., and Respondent, represented by Aimée S. Lin, Esq., and an evidentiary hearing having been held on July 30, 2024, and August 6, 2024, hereby AWARD as follows:

## I.     **Pleadings**

Claimant[1] filed his Demand for Arbitration ("Demand") on February 17, 2023, naming as Respondent[2] the law firm where he had been Counsel and then Partner. The Demand alleged: "The Parties entered into an agreement through which Claimant provided legal services in exchange for certain percentages of the fees billed.  Respondent failed to fulfill its obligations under the contract and has failed to pay Claimant amounts owed under the contract."  The Demand sought $410,000.00 plus attorney's fees, interest and arbitration costs.

Respondent filed its Answering Statement and Counterclaim together with an Addendum ("Answer and Counterclaim") on February 17, 2023. Respondent asserted that it had paid Claimant "all amounts due under the agreement between the parties." Respondent further asserted that Claimant "owes respondent for Claimant's portion of the rents, additional rents and other amounts due and payable by Respondent in connection with offices leased by Respondent for Claimant pursuant to the agreement between the parties." The Counterclaim sought $36,055.15 plus attorneys' fees, interest and arbitration costs.[3]

Claimant filed his Answer to Counterclaim on March 24, 2023, denying

---

[1] Claimant is referred alternatively as "Claimant" or "Mr. Klug".

[2] Respondent is referred alternatively as "Respondent" or "BurgherGray".

[3] In its post-hearing submissions, Respondent amended the amount due in its Counterclaim to be $48,559.01.

"that he owes any portion of the rents, additional rents or other amounts in connection with offices leased by Respondent. Pursuant to the parties' agreement, Claimant is not responsible for office space leased by Respondent. Additionally, Respondent affirmatively asked Claimant to vacate the office space despite Claimant's offer to stay in the space."

## II.    Appointment of Arbitrator

On March 30, 2023, I accepted the American Arbitration Association's ("AAA") appointment of me as Arbitrator in this matter.

## III.    Pre-Hearing Orders, Discovery, and Motions

I held numerous pre-hearing conferences and issued numerous pre-hearing orders.[4]

### a) April–August, 2023

On April 18, 2023, I held the first preliminary conference. Among other items, the parties agreed that "[n]o further pleadings are required" and that "[a]ny other preliminary matters not otherwise provided for [in the Preliminary Hearing and Scheduling Order #1 ("PHSO#1")] shall be raised by the parties by June 20, 2023." The parties also "indicated a desire to file a dispositive motion," and the PHSO#1 provided that the parties would have to obtain my permission to do so

---

[4] Certain pre-hearing orders inadvertently were misnumbered.  Misnumbered orders are referenced herein by date when relevant.

pursuant to the Commercial Rules. The parties were directed to exchange "all discovery requested, and all discovery anticipated to be required by both sides for the arbitration" no later than June 13, 2023. The next pre-hearing conference was set for June 20, 2023, at which time the date of the arbitration hearing was to be set.

On June 20, I held a second preliminary conference and, after circulating a draft to the parties for their review, issued a second Pre-Hearing Scheduling Order. Among other things, it scheduled deadlines for the identification of fact and expert witnesses that the parties might call at a hearing, the submission of a stipulation of uncontested facts, and the pre-marking of joint and contested hearing exhibits. It further provided the following with respect to the production of documents:

8. Document Requests.

(a)  On or before June 30, 2023, Plaintiff shall produce the spreadsheet(s) ("Spreadsheet") of invoices that Plaintiff claims he authorized Defendant to send to clients, representing the basis of damages (both compensation and incentive compensation) to which Plaintiff is seeking recovery.

(b)  On or before July 31, 2023, Defendant shall confirm whether and which of the invoices reflected on the Spreadsheet was sent to clients; which invoices were collected; the dates when they were collected; and what amounts were paid on each date.

(c)  If Defendant did not send any client one or more of the invoices reflected on the Spreadsheet ("Unsent Invoices"), on or before August 15, 2023, Defendant shall produce a copy of any invoice that captures the time charges reflected on such Unsent

Invoices. If Defendant never sent an invoice that captured the time referenced in an invoice on the Spreadsheet, on or before August 15, 2023, Defendant shall identify the Unsent Invoice and provide the underlying documents reflecting time charges not invoiced.

(d) Defendant is to produce bank statements that reflect receipts for work done by Plaintiff that resulted invoices to clients and payments by clients for work done by Plaintiff or under his supervision or direction (i.e. for which he would get incentive compensation credit or entitlement to money).

(e) The Parties do not currently expect to offer any other documentary evidence beyond the items described above.

(f) If either Party intends to rely on documents other than those set forth above ("Additional Documents"), that Party shall promptly notify the other Party and the Arbitrator and produce the Additional Documents to be offered on or before September 1, 2023. The opposing Party shall serve written objections to the Additional Documents on or before September 8, 2023, and any reply must be served on or before September 15, 2023.

(g) Except for good cause shown, a Party may not rely upon a document that was not produced to the other side, or for which notice of its use was not given at least 30 days prior to the Hearing.

At the June 20 conference, a Final Pre-Hearing Conference was set for October 4, 2023, and the evidentiary hearing was set for October 16 and 17, 2023.

On August 23, 2023, Respondent sought an extension of time to comply with the June 20 discovery deadlines. On August 25, Claimant objected to the requested extension of time, noting that BurgherGray had failed to "provide an

accurate accounting of Mr. Klug's and the firm's clients and amounts owed to Mr. Klug."

    b) _Respondent's Motion to Amend Counterclaim and Claimant's Threat to Add Claim of Fraud: September–October 2023_

In September 2023, Respondent sought to amend its Counterclaim to allege that "…to the extent that Claimant accepted client payments for work Claimant performed while Claimant was employed by Respondent, Respondent is owed those payments," Claimant objected and threatened to amend its Demand to allege that the new counterclaim constituted fraud.

  On September 6, 2023, I granted a three-week extension of the discovery deadline and ordered the parties to confer and seek to agree on the outstanding discovery disputes. I also set a deadline for Respondent to submit its proposed amended pleading, together with its supporting motion, and for Claimant's opposing paper. I did not at that time address whether to permit Claimant to amend his Demand to allege fraud.

On September 15, 2023, following a further exchange of correspondence on the subject, I issued PHSO#4 identifying an issue that should be resolved before allowing the pleadings to be amended:

    Upon review of the parties' submissions respecting Respondent's motion to amend its Answering Statement to include a Counterclaim, it appears that further evidence is required to determine whether the proposed Counterclaim would be futile. …

Claimant's September 14, 2023, letter in opposition to the motion to amend the Answering Statement argues that the proposed new Counterclaim will prejudice Mr. Klug, in part, *"because Mr. Klug made no such requests to third parties nor received any such payments…."* Mr. Klug fleshes out why this means he will be prejudiced if the amendment is permitted, reciting that "Mr. Klug will be required to obtain statements from those parties attesting to the fact that they never received invoices or that they did receive an invoice and paid BurgherGray."

I see Mr. Klug's assertion that he received no client payments as relevant to the issue of futility.

The current state of the submissions can be summarized by reciting that Respondent has not actually gone so far as to allege that Claimant received payments from BurgherGray clients which should have been paid to BurgherGray; and Claimant denies that he received any payments.

In order to discern whether the proposed Counterclaim has any viability, I need further submissions.

**<u>Order:</u>**

1. I direct Respondent to produce any evidence it has to support the possibility that Claimant was paid money by clients that should have been paid to BurgherGray no later than Wednesday September 20.

2. In the event that BurgherGray produces any such evidence, I direct Mr. Klug to submit by Monday September 25 an affidavit or other evidence establishing why Respondent's evidence would be unavailing at a hearing.

On October 4, 2023, the parties notified me that they withdrew their

threatened amended pleadings, and I issued PHSO#6 confirming that "the parties

withdrew their respective motions and applications to amend the pleadings in this

case."

c) *Motion for Leave to File Summary Judgment: October 2023–February 2024*

At the October 4, 2023, conference both parties also sought to file motions for summary judgment. I agreed to adjourn the October 16 and 17 hearing dates and set dates for the summary judgment motions to be filed, also requiring the parties to "simultaneously submit a stipulation of the material facts not in dispute."

Claimant and Respondent filed their cross motions for summary judgment on October 20, 2023, but as of February 7, 2024, after several adjournments so the parties could complete discovery and resolve disputed issues of material facts, I wrote in PHO#8:

> [B]oth parties chose to proceed by summary judgment in lieu of a hearing. In their submissions on the cross motions for summary judgment, both parties failed to agree on the material facts, necessitating the discovery that I ordered. If material facts remain in dispute respecting how much is owed, as I indicated already, a hearing may be required.

Accordingly, I granted an adjournment of the argument and directed the parties to submit a stipulation containing the undisputed issues of material fact no later than the close of business on February 22.

The parties continued to demonstrate an inability to agree upon the material facts not in dispute, and progress appeared stalled in reaching a stipulation as to those facts. Claimant persisted in his claim that Respondent had not produced the

firm's accounting documents that reflected the work done, invoices sent, or fees paid. This resulted in my sending the following email to the parties on February 21, 2024, noting that the parties still had not addressed whether they would comply with my directive in PHO#8 to submit the stipulation of undisputed facts by Noon on February 22, when they were due:

> [Claimant's] email asserts that the current state of discovery "is making it difficult to complete a joint statement of undisputed facts." [Respondent's] email today does not reference whether or when the stipulation of undisputed facts will be submitted, even though they are due tomorrow. Taken together, this exchange underscores my concern that the parties may be best served if this case proceeds directly to hearing, unless the parties stipulate that there are no material facts in dispute and set forth all the undisputed material facts. My consent to proceeding with summary judgment remains premised on the parties entering such a stipulation. A determination of the merits warrants a hearing if material facts remain in dispute. The Commercial Rules authorize me to determine whether the case should proceed directly to a hearing or by summary judgment. The rules also allow me to fashion remedies—including allowing me to draw adverse inferences—in the event that a party does not comply with its discovery obligations. Based upon [Respondent's] representation that she will produce everything required by Friday, I will give [Claimant] until Noon this Tuesday February 27 to inform me whether he has received the discovery he is entitled to and needs. I will give the parties until 2PM Eastern me on Friday, March 1 to submit a stipulation of the undisputed material facts and an agreement that there no material facts remain in dispute. These dates are firm. Both parties shall inform me no later than 2PM Eastern time on Friday, March 1, whether they want to persist in the motions for summary judgment or whether they want to proceed directly to a hearing. If either party wishes to persist in its summary judgment motion, I will determine whether to issue an award on summary judgment or order a hearing. If I determine to proceed with a hearing, I will make every effort to fix a firm date for the speedy completion of this case. The parties should be prepared to agree upon a prehearing schedule for the production and exchange of

all exhibits and the identification of all witnesses. Each party will be required to submit Proposed Findings of Facts and Conclusions of Law prior to the outset of the hearing, as well as a list of those exhibits to which there is an objection and the grounds for the objection.

My email and Claimant's contention that Respondent was not complying with discovery orders resulted in the following lengthy explanation from Respondent on February 21, 2024, about the difficulties that it faced:

> This firm is the pro se respondent ("BurgherGray" or "Respondent") in the above-referenced matter. This is in response to the letter of claimant Christopher Klug ("Claimant") to the Tribunal dated February 16, 2024.
>
> By his letter, Claimant again tries to vilify Respondent and impugn Respondent's good faith efforts at complying with its obligations in this case.
>
> As Respondent stated in its February 6, 2024, letter to the Tribunal, Respondent has been working diligently to complete its analysis and production pursuant to the Tribunal's Pre-Hearing Order #7 (the "Order"). This has been a painstaking process started from scratch by BurgherGray's Accounting Manager, Elijah Tate, with substantial effort by Gopal Burgher, Respondent's Managing Partner; the process was started from scratch because Claimant has called into question and is making claims anew regarding matters that were previously settled as between the parties, making it necessary to start from scratch to achieve the greatest amount of accuracy possible. The process has involved cross-checking several sources of information, including but not limited to, Respondent's former and current billing system and invoices, numerous years' worth of bank statements for two separate accounts (operating and trust), years of email history form various accounts, as well as Mr. Burgher's institutional knowledge. The process has proved extremely time-consuming and cumbersome and has required dozens of hours of rigorous effort by people who otherwise have regular day job with other responsibilities.

Nevertheless, Respondent was able to produce to Claimant the enclosed updated spreadsheet addressing payments in connection with Claimant's clients on February 15, 2024 (the "Updated Spreadsheet").

As explained previously, BurgherGray has faced a number of challenges in producing its accounting in this case for a number of reasons, not the least of which includes the migration of its billing and client management functions to a new system toward the end of Claimant's tenure with the firm. This migration was a massive undertaking and, as might be expected in a data migration undertaking of such magnitude, things did not go nearly as smoothly as hoped or anticipated, for both technical reasons and human errors. The result was many gaps and/or errors in in the way data is currently reflected in Respondent's client management and accounting system, including data ending up in the wrong location or files that are missing meta data necessary to index them to the correct clients and matters. While the firm has made significant progress, the remediation process is ongoing with new issues being discovered all the time. Further complicating things, the administrative personnel responsible for much of the relevant recordkeeping functions, including members of Claimant's team, are no longer with the firm, and as such, they are not available to shed light on certain information gaps for purposes of the analysis. As such, the process was necessarily a very manual one, belying the need to supplement and interpret data in our client management and accounting systems.

So, while Claimant insists that BurgherGray should be able to arrive at an accounting through a touch of a button (and, indeed, this is the case for post-migration data), the circumstances here are much more complicated with respect to pre-migration historical data, mostly due to circumstances outside of Respondent's control.

With respect to Claimant's complaint that "this process is not progressing, but that Respondent has regressed", and "Respondent now disclaims its own earlier representations" is simply not true. In fact, it is Claimant who appears to be backtracking and calling into question settled matters, including adding to his list of claims matters for which he previously acknowledged receiving payment.

For example, on line 85 of the Excel spreadsheet produced as R000602, a copy of which is enclosed (and line 84 of the Updated Spreadsheet), I note that a payment by a potential client of Claimant was made by "mobile deposit; unclear if made by [Mr. Klug's] client [Thilo Manning]". Mr. Tate made a note in response: "Check was for client RMS, not Thilo Manning." Therefore, if one looks at the spreadsheet and its notes carefully, it is clear there is no disclaimer of an earlier representation. Rather, it is confirmation that, although the payment previously appeared to be a possible payment by a client of Mr. Klug's, the payment was ultimately not paid by a client of Mr. Klug's after further investigation.  It is such time-consuming additional investigation to supplement information in the firm's client management and accounting system that is necessary to vet the massive amount of data included in Claimant's spreadsheets, resulting in the need for additional time.1

1 I also note that Respondent produced R000602 back in July 2023; I        made notations of possible payments by Mr. Klug's clients but made notes in situations where I was unsure whether the payment was in fact made by a client of Mr. Klug's. At any time I had to make an inference about a payment (such as where the amounts did not match the amounts on the original Klug spreadsheet), I made notes so that it would be clear that further investigation was warranted. I made notations of potential payments based upon the information I had at the time, but made the notes in anticipation of the information changing as discovery progressed in this case. Again, Claimant tries to paint this as somehow nefarious, when it is clearly not the case.

 Another example is on line 141 of R000602 (line 140 on the Updated Spreadsheet), where I noted that the payment was made by "mobile deposit DC; unclear if made by [Mr. Klug's] client [AppointMaster LLC Acquisition]." Mr. Tate made a note in response: "no payment received/$13,200 payment is for another client." Again, this is not a disclaimer of an earlier representation. Rather, it was clarification that a possible payment by a client of Claimant was indeed not a payment by a client of Claimant upon further investigation. There are other similar examples that Respondent will not belabor here.

Moreover, because of the additional research undertaken by Respondent, Respondent was able to confirm and recorded previously unconfirmed payments, such as at lines 160, 221 and 268 of the Updated Spreadsheet.

Thus, Claimant's blanket statements impugning Respondent are misleading and wrong, and should not have been made absent a more thorough examination of Respondent's analysis made in compliance with the Order. In keeping with Claimant's rush to judgment, Claimant himself has cited authority in his analysis that, upon closer review, does not support the payments indicated (see, e.g., lines 28, 32, 37, 39, 96 and 187 of the Updated Spreadsheet).

Respondent is, and has been, treating this matter with utmost priority and proceeding in good faith and as quickly as possible; however, the exercise of going through all of Claimant's line items and vetting them against our records does take a significant amount of time and cannot be done with the push of a button as it necessarily involves a fair amount of manual input. Therefore, Claimant's nebulous demand that Respondent "must be held to the agreed timing and procedures so that this dispute can be resolved" should be denied. After rushing Claimant [sic] to produce an accounting shortly after termination of employment, Claimant ignored Respondent's accounting for more than a year after receiving it, but would now have us all believe that this matter must be resolved with urgency and that Respondent is the one engendering delay.

In the meantime, Respondent continues to work on its analysis of alleged payments made to BurgherGray for work performed by Claimant for BurgherGray clients, as well as production of documents in compliance with the Order.

On February 23, 2024, following more correspondence from the parties, I granted an adjournment, writing: "In light of the recent correspondence, I am adjourning the oral argument scheduled for Monday until the parties resolve whether to stipulate to the material facts and decide to whether to proceed by summary judgment."

On February 27, I wrote an email to both counsel, inquiring if Claimant had received the discovery and informing both counsel:

> I have already ruled that the motions for summary judgment may not proceed unless the parties enter a stipulation that there are no disputed issues of material fact and set forth the undisputed material facts. I encourage the parties to let me know before the deadline of Noon this Friday, if you are able to advise me that the parties have/will reach a stipulation and will proceed by summary judgment. If the parties cannot enter a stipulation of the undisputed material facts, I will instruct the parties on what steps they should take to prepare for a hearing. We have the following options respecting Monday's Zoom: If all of the conditions that I set forth have been satisfied to permit the parties to proceed with their motions for summary judgment, Monday's Zoom can be used for oral argument. If the parties do not agree that there are no material facts in dispute, we can convert Monday's call to a status conference to create a scheduling order for a hearing on the merits. As I previously indicated, the parties should inform me no later than 2PM Friday, when the stipulations of undisputed material facts are due, whether they will persist in the summary judgment motions, in which case we will have argument on the summary judgment motions on Monday. Alternatively, if the parties inform me that the conditions for summary judgment have not been met, I will convert Monday's Zoom to a status conference about the hearing schedule.

On February 27, Claimant wrote:

> We write because we did not receive by February 23rd the evidence BurgherGray promised, let alone the evidence necessary to resolve this dispute.  While we ultimately received BurgherGray's completed response to Pre-Hearing Order #7 on Sunday, February 25th, it remains incomplete and unreliable.  In light of BurgherGray's correspondence of February 21, 2024, there is little prospect that it will ever be complete.  As we evaluate the best way to move forward, we therefore do not believe that it is possible to agree on "a stipulation of the undisputed material facts and an agreement that no [] material facts remain in dispute" as required by your order of February 19, 2024. . . .

On February 29, I withdrew permission for the parties to proceed by

summary judgment, writing:

> [Claimant's]letter dated February 27, 2024 states that he does 'not
> believe that it is possible to agree on a stipulation of the undisputed
> material facts and an agreement that no [] material facts remain in
> dispute', Monday's Zoom now scheduled for 9AM Eastern will no
> longer be an argument on the pending summary judgment motions....
> Accordingly, I withdraw any permission for either side to proceed by
> summary judgment in this case. On Monday morning at 9AM Eastern
> Time we will proceed with the scheduled Zoom conference at which
> me we will set a hearing date. . . . The parties are directed to discuss
> and agree upon dates by which each task is to be completed and when
> the hearing will take place. . . .

### d) *Claimant's Motion for Leave to File D.C. Wage Act Claim Seeking Treble Damages and Attorneys' Fees: November 2023*

On November 29, after the parties had filed motions for summary judgment

but before the parties had completed the final document production discussed

above that would have enabled them to stipulate to the material facts not in dispute,

Claimant informed the AAA staff for the first time that he was requesting treble

damages and attorneys' fees. According to his letter, "the requested damages for

Klug's breach of contract claim now equal $1,819,448.66, including attorney's fees

and costs." Claimant did not inform the AAA staff that the treble damages claim

arose from the D.C. Wage Act[5] or that the claim was different than the breach of

---

[5] D.C. Code § 32-1301(3).

contract claim contained in the Demand. The ostensible reason for the November 29 letter was to inquire if additional administrative fees were required, because the amount claimed was an increase from the initial Demand of $410,000.00.

Claimant did not give me prior notice of its request to the AAA staff.

The AAA staff responded that an increase in the amount requested did not require an additional deposit, presumably on the mistaken belief that the new request was based on the same claim for relief that was contained in the Demand. In any event, the staff did not rule that Claimant could add a new claim to the Demand.

Following this exchange with the AAA staff, Claimant for the first time sought to file the new D.C. Wage Act Claim. Claimant implied that the staff's response that no additional deposit was required was a determination by the AAA that he was permitted to file the new claim for treble damages and attorney's fees under Rule 6(a).

Claimant is mistaken on the law, and he misapprehends the staff's response as ruling that he could file the Wage Act Claim. The staff's response stated only that he need not increase his deposit based on the limited disclosure contained in Claimant's inquiry as to whether an increase in damages required an increased deposit. The staff did not rule that that the proposed treble damages claim was the same breach of contract claim in the Demand, and Claimant did not inform the

staff that he had not obtained my permission to increase damages sought, as he was required to do, for the reasons explained below.

I determined that the Wage Act Claim is different than the claim alleged in the Demand. The Wage Act Claim asserts a statutory right. The Demand asserts a contract right. The two are different. The D.C. Wage Act involves different elements than the contract claim. Under the statute, no contract is required. The D.C. Wage Act requires proof that the Claimant is an "employee", the Respondent is an "employer," and the monies due are "wages." Claimant appears to presume the D.C. Wage Act uses those terms in the same way as they appear in the Agreement. The case law does not support that view at least as to the role of the employer and employee. A close reading of *Sanchez v. Magafan*, 892 A.2d 1130, 1134–35 (D.C. 2006), which Claimant cites in his post-hearing brief, reveals why Claimant is in error. *Magafan* relies in part on *Beegle v. Restaurant Mgmt., Inc.,* 679 A.2d 480, 485 (D.C. 1996) which makes clear that the requisite employer-employee relationship under the Wage Act requires proof that BugherGray exercised control over Mr. Klug's work that is not contained in the Agreement.[6] According to *Beegle*, under the D.C. Wage Act, a plaintiff must

---

[6] Although not an issue at the hearing, Mr. Klug's testimony about the work he performed suggests that BurgherGray did not exercise the kind of oversight that *Beegle* requires for statutory relief. (See Tr. 85 et seq.) In fact, Claimant's counsel underscored that Mr. Klug's claim was for work that he performed autonomously at BurgherGray. According to counsel, under the Of Counsel Agreement "… he worked for BurgherGray clients while maintaining his own separate practice" and under the Partnership Agreement

establish that the "employer" had "the right to control and direct the work of [the alleged employee], not only as to the results achieved, but also as to the details by which that result is achieved." In other words, the D.C. Wage Act claim requires resolution of an element not present in the contract claim.

I did not allow Claimant to add the new D.C. Wage Act Claim after I determined that it was different in nature and kind than the contract claim set forth in the Demand.

Claimant argues that my decision was in manifest disregard of New York law which Claimant says would permit him to file the D.C. Wage Act claim. However, at the conference when this issue was raised, I indicated that I had considered whether New York's choice of law's interest analysis might permit a D.C. Wage Act claim, but I did not need to determine whether Claimant stated a claim under the D.C. Wage Act. Rather, a threshold question was whether, under AAA Rule R-6(b), I would exercise my discretion to permit Claimant belatedly to file the D.C. Wage Act claim.

In the exercise of my discretion, I denied Claimant permission to file the new statutory claim. My reasoning was straightforward. First, the Demand alleged

---

where he "joined BurgherGray and worked under the auspices of the BurgherGray flagship" and was "supposed to be paid for work that he performed for BurgherGray clients, he was supposed to be [paid] - for work that he performed for his own clients that he brought. And he was supposed to be paid for work that he brought into the firm that other attorneys did." (Tr. 9). There was no testimony or argument that BurgherGray control and supervision of Mr. Klug's work was a component of the Agreement or a condition for Mr. Klug to be paid for the performance of his duties.

only a breach of contract claim. Second, at the first pre-hearing conference more than 15 months earlier, both sides had said that there would be no amended the pleadings. Third, there had been extensive discovery, and Claimant frequently complained that Respondent had delayed the proceedings by not fulfilling its discovery obligations. Fourth, none of the discovery requested or produced concerned whether Claimant was an "employee" or Respondent was an "employer" under the D.C. Wage Act, as that relationship is defined in *Beegle*. Fifth, the discovery that was sought and produced concerned contract damages under the Agreement. Sixth, the discovery process did not go smoothly; it required my intervention on multiple occasions, far more than I had anticipated at the first Pre-Hearing Conference. Discovery disputes festered because the parties failed to communicate. Even after my intervention, the parties reported that they had been unable to resolve their differences. Seventh, Claimant frequently objected that the pace of the discovery process was too slow. He objected to Respondent's requests for more time to comply with my production orders and also to my granting Respondent more time on the ground that he had waited too long to recover the backpay under the Agreement. Eighth, despite my urging that it would be more efficient to proceed to a hearing, both sides insisted on filing motions for summary judgment. I permitted the parties to proceed as they wished on condition that they enter a stipulation setting forth the undisputed material facts and whether there

were material facts that needed to be tried. Ninth, the parties already had filed cross motions for summary judgment. In Claimant's motion, he made no mention that he was seeking treble damages, that the D.C. Wage Act applied, or that he would amend his pleadings to allege the new statutory claim. To the contrary, Claimant argued that he was entitled to damages on three grounds, all of which sounded in contract: breach of contract, promissory estoppel, and unjust enrichment. Tenth, as Claimant himself informed me, the parties failed to arrive at a stipulation of undisputed material facts. Finally, neither party had briefed the meaning of "employer" or "employee" under the D.C. statute—questions that might require further discovery or reveal disputed facts requiring a hearing.

There was another consideration worth recounting. After I initially told the parties at a pre-hearing conference that—without ruling—I did not think I would permit the new D.C. Wage Act claim under the AAA Rules because it was not timely, Claimant asserted that the statutory claim should have come as no surprise. Claimant explained that Respondent must have known from the outset that he was relying on the D.C. Wage Act because the Demand had requested attorneys' fees that were not provided under the Agreement but were permitted under D.C. Wage Act. Claimant's excuse did not explain why he intentionally did not raise his treble damages claim until after I granted permission to file motions for summary judgment and after he had filed his brief in which he made no mention of the D.C.

Wage Act or treble damages.   Indeed, Claimant's silence as to why he never

indicated that he sought statutory treble damages either to Respondent, as the party

from which he sought the damages, or me, as the tribunal empowered to order the

damages, had the unintended consequence of suggesting that Claimant had been

seeking strategic advantage by hiding the ball from the outset.

As I informed Claimant at the time, his assertion that I could not impose

attorneys' fees based on the current pleadings was mistaken, in any event.  Rule R-

49(d) expressly provides that "[t]he award of the arbitrator may include . . . an

award of attorneys' fees if all parties have requested such an award[.]" Here, both

sides requested attorney's fees in their initial pleadings.

One final point is worth making. The AAA's determination that Claimant

need not increase his deposit did not mean that he did not need my permission to

increase the amount of his Demand, even if the Wage Act Claim was not deemed to

be a new claim. It is within my purview as Arbitrator to refuse to permit Claimant

to amend his Claim both because the D.C. Wage Act sought to increase the amount

of the claim and because the statutory claim was a new claim. Rule R-6,

concerning "Changes of Claim," speaks both to increases in claim amount and to

addition of new claims. It provides:

> (a)    A party may at any time prior to the close of the hearing or by
> any earlier date established by the arbitrator increase or decrease the
> amount of its claim or counterclaim. . . . After the arbitrator is
> appointed, however, a party may increase the amount of its claim or

<u>counterclaim, or alter its request for non-monetary relief, only with the arbitrator's consent</u>.

(b)    Any new or different claim or counterclaim, as opposed to an increase or decrease in the amount of a pending claim or counterclaim, shall be made in writing and filed with the AAA, and a copy shall be provided to the other party, who shall have 14 calendar days from the date of such transmittal within which to file an answer to the proposed change of claim or counterclaim with the AAA. <u>After the arbitrator is appointed, however, no new or different claim or counterclaim may be submitted except with the arbitrator's consent</u>.

(Emphasis added).

## IV.  <u>The Hearing and Post-Hearing Briefs</u>

After resolution of motions and scheduling issues, the parties submitted pre-hearing briefs, undisputed and disputed hearing exhibits, and stipulations.

The hearing was conducted by Zoom on July 30, 2024, and August 26, 2024. Christopher Klug and Gopal Burgher both testified. The parties stipulated that the written comments on Joint Exhibit J-3 made by Elijah Tate, Respondent's account manager, as to the entries on Joint Exhibits J-2 and J-3 would be received in evidence as if Mr. Tate had testified.  *See* Tr. 309:15–23.

Following the hearing, each side simultaneously exchanged a Post-Hearing Brief, a Brief in Opposition to the other side, and a Reply Brief. The parties also submitted Proposed Findings of Fact, Opposition Findings, and Reply Findings. The submissions were accompanied by numerous affidavits and exhibits, including Excel sheets. None of the briefs contained the hyperlinks required in my

preliminary orders; consequently, at my request, Claimant filed corrected briefs containing hyperlinks, and Respondent submitted copies of the cases cited in its briefs together with an index.

In connection with the post-hearing briefing, on October 11, 2024, Respondent filed a revised Post-Hearing Reply Brief purporting to update calculations which Respondent wrote "do not relate to any recordkeeping on the part of BurgherGray. Rather, it related to the fact there were numerous moving parts as the parties completed the hearing and its Post-Hearing Briefing."

Respondent explained that the new calculations differ from the original brief for two reasons:

1. There was a misunderstanding as to how I wanted BurgherGray to make calculations for purposes of the Post-Hearing Briefing; and

2. We updated some of the line items in Exhibit J-2 from disputed to undisputed just prior to the commencement of the hearing. This led to some confusion on Respondent's side.

I gave Claimant an opportunity to submit a supplemental response to this supplemental submission. On October 25, 2024, Claimant objected to the supplemental brief and argued that the "updated numbers" are not "calculations", but rather constitute "new arguments" that are "incorrect and inconsistent with testimony" and should be disregarded "as out of time."

### V. The Partnership Agreement

The portions of the Agreement relevant to the Claim provide:

c. Performance-Based Incentive Compensation. For each calendar year, in addition to your base salary, the Firm will make the following payments to you upon satisfaction of all relevant conditions:

    i. if the total amount of business originated by you and collected by the Firm during such calendar year equals at least $600,000, the Firm will pay you an additional amount of $90,000; provided that such threshold and compensation amounts will be prorated for calendar year 2020 so long as the total collected for such year at least equals the Base Revenue Shortfall (as defined below) for the relevant period; and

    ii. the Firm will pay you 50% of the total amount in excess of $600,000 collected in respect of business originated and executed by you;
    . . .

    iv. with respect to work originated by others and executed by you, the Firm will pay you 40% of the amount billed and collected for work executed by you;
    . . .

Notwithstanding anything herein to the contrary, you must be employed by the Firm at the time any amount payable under this Section 3(c) is fully earned[4] in order to be eligible to receive such Amount.

---

[4] Meaning there is no contingency or outstanding condition other than lapse of time to the due date to which payment is subject.

The portion of the Agreement relevant to the Counterclaim provides:

You [meaning Klug] agree that if you should resign or otherwise leave your position with [BurgherGray] … prior to the expiration of any lease entered into by [BurgherGray] for DC office space within the next 6 months, you will be responsible for paying to [BurgherGray] a pro rata share (to be agreed at or prior to time of lease signing) of all rents, additional rents and other amounts due and payable by [BurgherGray] under such lease until the expiration of such lease; *provided* that, so long as the circumstances surrounding

your departure are such that it is feasible and practicable for you and [BurgherGray] to peacefully co-exist in the space, you will have a right to utilize your agreed pro rata share (based upon amount paid by you relative to total amount payable by [BurgherGray]).[7]

## VI.    Parties' positions:

### a) Claimant's Claims

Claimant asserts that he is entitled to damages arising from Respondent's failure to pay him the bonus amounts due under the Agreement. Under the Agreement, he is entitled to fifty percent of all amounts above the prorated threshold for each year:  $200,000.00 in 2020, $400,000.00 in 2021.[8] Mr. Klug also claims he is entitled to pre-award interest since 2020 and 2021.

Mr. Klug's post-hearing submissions summarize his claims for "wages" –or incentive payments—that derive from the fees for which he has not been credited as follows:

| | |
|---|---|
| 2020 Wages Owed | $176,328.10 |
| 2020 Referral Work | $36.792.30 |
| 2021 Subtotal Wages Owed | $569,335.36 |
| BG Payments Made | ($163,254.40) |
| Subtotal Wages Owed | $406,098.96 |
| Reasonable Attorneys' Fees | $199,306.00 |
| Costs | $43,822.50 |
| Unreimbursed Expenses | $2,505.50 |
| Interest | $184,457.17 |
| TOTAL OWED | $836,190.12 |

---

[7] PF at ¶ 31.
[8] J-1, Partner Agreement § 3(c)(ii).

Claimant asserts that BurgherGray does not contest the majority of the work recorded, invoiced, and collected on Mr. Klug's spreadsheet and sets forth the amounts that he believes BurgherGray does not contest as follows: of the total $988,843.00 Mr. Klug invoiced for his clients, BurgherGray does not contest that $754,395.00 was invoiced and collected. According to Claimant, the parties dispute $234,448.00 of the collections.[9]

Mr. Klug claims he should be credited with $18,048.40 of the disputed amount because Respondent's objection rests on the fact that it has no record that those sums were invoiced. Mr. Klug argues, among other things,[10] the absence of BurgherGray records does not establish that the invoices were not sent because BurgherGray's records are not reliable. Moreover, Claimant argues that he carried his burden of proving damages by his own testimony, the reliability of his spreadsheets, and the prior conduct of his clients paying for work he performed on their behalf. Claimant also contends that BurgherGray cannot shift the burden to him for its failure to send or collect invoices that were not paid. Mr. Klug argues that I should also draw negative inferences against BurgherGray from its failure to

---

[9] The claims made by Claimant do not match the amount of disputed and undisputed fees that Respondent's post-hearing submissions argue should be credited to Claimant. Nor do the parties agree on the wages that would flow if he were credited for the collection of those fees. In any event, Respondent does not agree that Claimant is entitled to wages totaling the $406,098.96 that Claimant demands.

[10] Claimant points out that six out of eight of these unsent or uncreated invoices were from Mr. Klug's final two months at BurgherGray.

maintain and/or produce accounting records of work that he performed, bills sent and client payments.

For similar reasons, Mr. Klug argues that he should be credited with $108,842.75 in 39 invoices that BurgherGray concedes were created (and therefore that work was completed) but for which BurgherGray has no evidence of sending the invoices or collecting the amounts billed.

Mr. Klug also contends he should be credited for $23,394.00 in time worked which was invoiced, because BurgherGray previously acknowledged that the underlying eight invoices had been paid.

Mr. "asserts that he should be credited for payment by clients who previously had paid for services rendered by check (also called "counter credits") which account for $2,540.25 in 2020 and $15,545.00 in 2021.

He also claims credit for $9,080.13 for clients who historically paid by retainer, but BurgherGray refuses to credit because it has no record of a bank deposit.

Mr. Klug testified, and J-2 supports that he should be credited for $50,537.63 in payments for 2021 that BurgherGray disputes.

Mr. Klug also disputes BurgherGray's refusal to credit $11,999.00 that it asserts were written off by the firm "per managing partner requested uncollectible"

when the write offs were taken without Mr. Klug's permission and those clients continue to pay his current bills.

    *b)  Respondent Defenses*

    Respondent agrees that the firm collected the following payments on work for which Claimant gets credit: $145,730.35 in 2020, $397,609.10 in 2021 and $150,628.70 in 2022. However, Respondent disputes that the firm was paid $96,595.85 in credits that Claimant attributes to 2020, and Respondent disputes that it was paid $244,009.66 in credits that Claimant attributes to 2021.

    Respondent argues that Claimant is entitled to none of the claimed $406,098.96 incentive bonus because Respondent's books do not reflect that Claimant generated $600,000.00 in firm collections in any given year as required by the Agreement to trigger the bonus payments.

    Respondent also asserts that Claimant overreaches in arguing that he should be credited for client payments that are not reflected on Respondent's books. Respondent argues that Claimant's methodology of inferring payments from client's prior patterns of paying is flawed and unreliable. In its "Amended" Post-Hearing Reply Brief, Respondent changed its prior position that Mr. Klug should not be credited for payments from clients who customarily paid by check because BurgherGray did not have firm records that reflected those payments. The Amended submission recited that BurgherGray was now crediting Mr. Burgher for

all bank payments that it had obtained from the bank. Respondent's position is now that even after crediting Mr. Klug with those payments, he remained $202,390.90 short of the $600,000.00 he needed to generate in 2021 to trigger the incentive bonus.

Respondent asserts that Claimant's calculation of amounts billed for hours worked is premised on the faulty assumption that Respondent billed Claimant's time at his normal hourly rate, disregarding that that some clients were billed at reduced rates or flat fees. Respondent points out that the Agreement did not require Respondent to bill Claimant's time at his customary rate, but rather permitted Respondent to bill his time at a reduced rate.

Respondent asserts that fees that might otherwise have triggered a bonus payment cannot be treated toward the incentive bonus because the fees were not collected in the period specified by the Agreement. Respondent argues that the disputed client payments were not collected in the same year that the work was earned, and some fees were received only after Claimant already had resigned.

Respondent also claims that Claimant failed to mitigate in that he did not make any attempt to collect the sums outstanding in contravention the expectation, identified in testimony by Gopal Burgher, that partners collect monies due.

Respondent argues that Claimant cannot seek to enforce the Agreement that he breached when he resigned from the firm and left the premises without giving the required 90 days' notice.

### c) Respondent's Counterclaim

Respondent Counterclaims that Claimant is responsible for his pro rata share of the rent for the office premises until the end of Respondent's sublease pursuant to the terms of the Agreement which provides:

> You [Klug] agree that if you should resign or otherwise leave your position with [BurgherGray] … prior to the expiration of any lease entered into by [BurgherGray] for DC office space within the next months, you will be responsible for paying to [BurgherGray] a pro rata share (to be agreed at or prior to time of lease signing) of all rents, additional rents and other amounts due and payable by [BurgherGray] under such lease until the expiration of such lease; provided that, so long as the circumstances surrounding your departure are such that it is feasible and practicable for you and [BurgherGray] to peacefully co-exist in the space, you will have a right to utilize your agreed pro rata share Respondent's main office is in New York, New York. (based upon amount paid by you relative to total amount payable by [BurgherGray]).

### d) Claimant's Defenses to the Counterclaim

Claimant raises several defenses to the Counterclaim. First, the Agreement contains a condition requiring the parties to agree to the amount of apportionment that never was met.

Second, Respondent failed to establish that it took reasonable steps to mitigate.

Third, Claimant had no duty to mitigate under these circumstances.

Fourth, Respondent breached other material terms of the Agreement and, therefore, cannot seek enforcement of the lease term.

Finally, Respondent expressly told Claimant to vacate the premises, relieving Claimant of any lease obligations by the terms of the Agreement.

## VII.  Findings.

I find that Claimant has satisfied his burden of establishing the damages in the amounts claimed in the Demand and that Respondent's defenses are without merit.

I find that Respondent is not entitled to any damages based on its Counterclaim and credit Claimant's responses to the Counterclaim.


## VIII. Reasoning.

### a)  *Claimant's Demand*

Christopher Klug entered into two agreements with BurgherGray, a Limited Liability Partnership in the District of Columbia.  The parties entered into an Of-Counsel Agreement dated September 19, 2019 ("Of Counsel Agreement").  (C-1).[11]

---

[11] The Of Counsel Agreement provided:
    a.  "Seventy percent of all monies collected by the firm for work performed by Mr. Klug". (§ 3(b)(ii));

On August 17, 2020, the parties entered the Partnership Agreement (the "Partnership Agreement").[12]  (J-1).

Collectively, the Of Counsel and Partnership Agreements are referred to as the "Agreement."

I find that Claimant's testimony was credible, and that the spreadsheets that he created (J-2) and updated (J-3) were accurate and reliable. Indeed, the Director of Operations at BurgherGray described the earlier iterations of J-2 as follows: "This is the absolute final spreadsheet that I have from all the payments that I was privy to." (C-2, KLUG_000245; C-3, email thread from M. Nieves and G. Burgher).

I find that Claimant established that he performed all the work listed on the spreadsheets contained in J-2 and J-3 and that he requested the firm to invoice the

---

b.  "Thirty percent of work originated by Mr. Klug but performed by others at the firm." (§ 3(d)).

[12] The Partnership Agreement provided that Claimant would be paid:
  a.  A base salary of $150,000 per annum "subject to all withholdings and deductions." (§3(b))
  b.  A $90,000 bonus ("Earned Bonus") if Mr. Klug originated and the firm collected at least $600,000 (the "Revenue Threshold") in a calendar year or prorated based on a partial year. (§ 3(c)(i)).
  c.  Fifty percent of the total amount exceeding the Revenue Threshold. (§ 3(c)(ii))
  d.  Ten percent of work originated by Mr. Klug and performed by others. (§ 3(c)(iii)).
  e.  Forty percent of work performed by Mr. Klug and his associates but originated by other members of BurgherGray.  (§ 3(c)(iv)).

amounts listed on the spreadsheets.[13]  (*See* Third Klug Affidavit ¶¶ 4-10; Hr'g Tr. 48:9-19).  J-2 was updated through this arbitration and was admitted as J-3.[14]

I find that, by contrast, the testimony of Gophal Burgher and Mr. Tate is not reliable because it was not based on BurgherGray's business records. Instead, the records that Respondents produced in discovery—the same records on which Mr. Tate and Mr. Burgher base their testimony—constitute attorney work product that was created for this litigation. When Claimant requested that I sanction Respondent for not producing documents required by my discovery orders, Respondents responded that its inability to produce the documents more quickly was not intentional but due to circumstances beyond its control. Counsel recited some of the problems Respondent had encountered, including that BurgherGray did not have the business records available, requiring the firm to recreate them:

> Respondent has been working diligently to complete its analysis and production pursuant to the Tribunal's Pre-Hearing Order #7 (the "Order"). This has been a painstaking process started from scratch by BurgherGray's Accounting Manager, Elijah Tate, with substantial effort by Gopal Burgher, Respondent's Managing Partner; the process

---

[13] Some of the proof offered by Claimant requires inferences drawn from each client's prior method of payment. For example, he demonstrated that some of his clients historically paid (and continue to pay him since he left the firm) by physical checks. (Klug Third Aff. ¶ 29). The Bank of America statements that Respondent did produce include "Counter Credits" which occur when the firm made a physical deposit at an actual bank. These bank records do not contain any detail as to how much money was deposited for each client, much less which client made the payment. (Id. ¶ 30). Nor did Respondent maintain or produce firm records containing that information.

[14] Mr. Burgher testified that BurgherGray did not have access to their accounting system from the majority of the relevant time period, and it was undisputed that their data migration for that time period to their current system had not gone well. (Tr. 272:6-10; 54:23-355:16). By contrast, BurgherGray also did not produce a business record of the firm that was created or maintained in the regular course of its business that reflected Mr. Klug's time, invoices, or collections.

was started from scratch because Claimant has called into question and is making claims anew regarding matters that were previously settled as between the parties, making it necessary to start from scratch to achieve the greatest amount of accuracy possible. The process has involved cross-checking several sources of information, including but not limited to, Respondent's former and current billing system and invoices, numerous years' worth of bank statements for two separate accounts (operating and trust), years of email history form various accounts, as well as Mr. Burgher's institutional knowledge. The process has proved extremely time-consuming and cumbersome and has required dozens of hours of rigorous effort by people who otherwise have regular day job with other responsibilities. Nevertheless, Respondent was able to produce to Claimant the enclosed updated spreadsheet addressing payments in connection with Claimant's clients on February 15, 2024 (the "Updated Spreadsheet"). As explained previously, BurgherGray has faced a number of challenges in producing its accounting in this case for a number of reasons, not the least of which includes the migration of its billing and client management functions to a new system toward the end of Claimant's tenure with the firm. This migration was a massive undertaking and, as might be expected in a data migration undertaking of such magnitude, things did not go nearly as smoothly as hoped or anticipated, for both technical reasons and human errors. The result was many gaps and/or errors in in the way data is currently reflected in Respondent's client management and accounting system, including data ending up in the wrong location or files that are missing meta data necessary to index them to the correct clients and matters. While the firm has made significant progress, the remediation process is ongoing with new issues being discovered all the time. Further complicating things, the administrative personnel responsible for much of the relevant recordkeeping functions, including members of Claimant's team, are no longer with the firm, and as such, they are not available to shed light on certain information gaps for purposes of the analysis. As such, the process was necessarily a very manual one, belying the need to supplement and interpret data in our client management and accounting systems.

Respondent's difficulty in formulating cogent reasons for denying Claimant payment of his incentive bonus continued after the conclusion of the hearing, when it filed its Amended Post-Hearing brief. Respondent's original post-hearing brief made the same argument that it consistently had made; namely, that Mr. Klug had failed to prove that clients had paid for work that he testified and that the spreadsheets showed he performed. The Amended Post-Hearing briefs reversed that position and assumed and that Mr. Klug should be credited for all the bank deposits that BurgherGray admitted it could not attribute to any specific client. Despite this concession, Respondent insists that even with those credits, Mr. Klug did not generate enough fees to trigger the incentive fees.

Respondent's concession is too little too late. Respondent does not acknowledge all the other mistakes, omissions, and gaps in its recordkeeping, which does not make up for the misinformation or mask the lack of information contained in BurgherGray's proffered documents. For example, Respondent does not account for client payments that came from the wire transfers, retainer agreements and transfers from trusts accounts. ( Tr. 113-186:3, J-2). Respondent also does not account for instances when BugherGray failed to issue invoices to clients in the amounts that Mr. Klug and the spreadsheets establish should have been billed. The testimony established that BurgherGray's difficulty with

maintaining accounting records predated this case.[15] Nor does Respondent account for certain payments that it admits clients in fact made but for which it retained no business record confirming payment.[16]

Respondent argues that the Agreement is ambiguous and therefore it should be permitted to offer purported parol evidence that client payments were "untimely." And Respondent blames Claimant for its failure to collect amounts outstanding for work originated by Claimant. As explained below, I do not find the Agreement to be ambiguous or that the proffered testimony constitutes parol evidence.

Respondent also argues that the spreadsheet (J-2) misstates the amount of his billable time because the spreadsheet does not account for the fact that the firm either discounted his hourly rate or charged a flat fee. This position is not tenable because it does not account for paragraph 4 of the Partnership Agreement, which requires that if BurgherGray was to bill Claimant's time at a flat fee or reduced rate, the parties first must reach an agreement "prior to commencement of services

---

[15] For example, Mr. Klug testified that as early as late 2020, he had tried to obtain information on client payments but was rebuffed by Mr. Burgher. (Tr.71:19-72:4). Mr. Klug also testified that he had requested information about which of his clients had paid and which had not, but that Respondent's accountant informed him that she did not have that information and that she was trying to find it by "digging through emails." (Tr. 72:13-73-24).

[16] For example, Mr. Klug testified that he did $40,000 worth of work. BurgherGray claims Mr. Klug only did 27.3 hours at $638 per hour. When admitting that it collected more than 100% of what Mr. Klug claimed: $43,409.00, BurgherGray cites to an invoice, INV001291, but did not produce that invoice.(BurgherGray Client Invoices Row 6, Column C). The failure to produce that invoice is an example of why I draw negative inferences against BurgherGray, as explained below.

by [Claimant] on such matters." Moreover, Respondent failed to offer a single retainer agreement, much less invoice, that contains a write-off or a flat fee.

Respondent also does not accept responsibility for the fact that BugherGray did not come forward with evidence of the bills that it sent to Mr. Klug's clients who owed money to BurgherGray for the work performed. Instead, Respondent asserts that Mr. Klug failed to satisfy his burden of proving that clients he generated actually paid their invoices. BurgherGray ignores Mr. Klug's detailed testimony that each of his clients on the spreadsheet (J-2) had paid BurgherGray for the work that Mr. Klug performed and for which they were billed while he was at BurgherGray. I credit his testimony as establishing that it is more likely than not that those clients would have paid bills that they were sent. (Tr. 113-186:3). As set forth above, BurgherGray's own accounting personnel acknowledged the accuracy of Mr. Klug's spreadsheets.

Respondent asserts that Mr. Klug did not satisfy his burden of proof because he offered no documentary evidence of payment. Although it correctly notes that it is Claimant's burden of proof, Respondent fails to recognize that it is Respondent's burden to come forward with evidence that it uniquely controls.   It has not carried that burden.  The records that BurgherGray produced do not constitute reliable business records. Instead, they amount to incomplete documents it has on hand that may be inaccurate because of the way they were created and other documents

recreated by Mr. Tate from information he gathered from a variety of sources and people in furtherance of the defense of this lawsuit. Respondent effectively admitted in its pretrial submissions, and Mr. Burgher confirmed in his testimony, that BurgherGray had to recreate the information "from scratch." The records it did produce were partial at best, and Mr. Burgher testified that even those records may have been inaccurate.[17]

There is evidence that, while Mr. Klug was still employed at the firm, BurgherGray affirmatively denied him access to banking records that would have shown client payments and outstanding amounts due. Specifically, when Mr. Klug was Of Counsel and partner, BurgherGray denied him access to firm records to track payments from clients. Mr. Klug credibly testified that he had sought to have the Director of Operations obtain "read-only" access to the bank accounts so that she could report accurately client payment information to him, but that permission was denied by Gopal Burgher. Contemporaneous emails corroborate Mr. Klug's testimony. (Tr. 74:9-75:25; C-28, Email from M. Nieves to C. Klug et. al (June 9, 2021) KLUG_000221 - KLUG_000222).

It is unconvincing for Respondent to rely on the absence of receipts in BurgherGray's records to show that payment was not made. For the reasons I

---

[17] Mr. Burgher testified: "We used Sage Timeslips and, you know, whether people were using it correctly or making entries when they were supposed to, you know, it's certainly, you know, come to my attention that that was not always done on time and people aren't always doing what they were supposed to do." (Tr. 356:22-357:1)

already have explained, the record is replete with evidence that Respondent's records are incomplete and unreliable, including Mr. Burgher's own admission that Respondent had difficulty complying with the discovery orders because it could not locate its records and had to "start from scratch."

Respondent raises the defense that Mr. Klug failed to mitigate his damages, reasoning that it was Mr. Klug's responsibility to collect the amounts owed by clients he generated. Respondent does not offer much to support its assertion. Mr. Burgher never asked Mr. Klug to help collect bills or outstanding payables, and Mr. Klug confirmed that he was never asked. Essentially, Respondent relies on a syllogism that Mr. Klug should have asked the clients to pay because they were clients that he generated. This logic is unpersuasive. Mr. Klug explained that asking clients if they paid would have put him in a bad light with his clients.[18] Mr. Klug further testified that he had no reason to ask his clients if they had paid because he believed that all his invoices were being paid in a timely manner.[19] More to the point, it is difficult to credit Respondent's attempt to shift

---

[18] According to Mr. Klug: "[I]f my attorney asked me if I paid their invoice and I have, in fact, paid the invoice, I would think they're messy and I wouldn't probably want to use them. ... And so, could I go and call every client? I really had no reason to think these invoices were not paid." (Tr. 69-70).

[19] Mr. Klug testified: "I would have expected to be notified that a client hadn't paid." (Tr. 70).

responsibility for collecting client fees when BurgherGray did not even give Mr.

Klug access to information about the unpaid bills.[20]

Respondent's defense that Mr. Klug was obligated to collect from clients

after he left BurgherGray makes no sense because Mr. Burgher never asked Mr.

Klug for help to collect outstanding bills.

Respondent again argues that by not collecting the outstanding bills for

Respondent after he left, Mr. Klug "failed to mitigate" his damages.[21] Mr. Gopal's

testimony that Claimant was obliged to collect his clients' unpaid bills is

unpersuasive. The clients were BurgherGray clients. The bills were sent by

BurgherGray. The clients owed the money to BurgherGray. To the extent that it

might have made sense for BurgherGray to enlist Mr. Klug's help to collect the

outstanding balances, Respondent came forward with no evidence that it made any

such request. In fact, Mr. Klug testified that Mr. Burgher never asked for help

collecting outstanding balances (Tr. 132) Nor is there any evidence the Mr.

Burgher informed Mr. Klug which clients had not paid or how much they owed.

---

[20] With respect to clients who Mr. Klug originated during the Of Counsel Agreement, it does not make sense that Mr. Klug was responsible to ensure billing and collection of the clients. Indeed, during September 19, 2019, to August 31, 2021, many of Mr. Burgher's generations were clients for whom Mr. Burgher had direct contact.

[21] This argument makes little sense, in any event, in view of Respondent's position that Claimant is not entitled to any bonus after he left the firm. BurgherGray cannot have it both ways.

In any event, Mr. Klug rebutted any claim that he failed to mitigate. Mr. Klug testified that he caused his client S&K Holdings to pay BurgherGray its overdue bill totaling $143,000.00. (Tr. 243). Mr. Klug testified that when he learned that S&K Holdings had not paid its outstanding bill, he told the client to remit full payment to BurgherGray. (Tr. 71-72). It is uncontested that S&K Holdings paid the outstanding $143,000.00 bill in full. Mr. Klug's behavior demonstrates that Mr. Klug stood ready and willing to help Respondent collect its fees if asked.[22]

My findings are not based on mere speculation. I find that Mr. Klug satisfied his burden of proving damages both by his own testimony and by negative inferences that I draw from the failure of Respondent to come forward with evidence that it was obligated to maintain and produce.

Respondent offered no credible evidence that Claimant withheld information or documents or that he inhibited Respondent in any way from creating, maintaining, or producing the records that Respondent should have possessed and produced. I find that Respondent was at fault for not maintaining or producing direct evidence of time entries, billable amounts, timely bills sent and collections for the matters at issue.

---

[22] This may also explain why Respondent withdrew its motion for leave to amend is counterclaim that Mr. Klug had collected money owed to BurgherGray after leaving the firm after I ordered that Respondent should come forward with proof that Mr. Klug had done so.

In requesting that I draw a negative inference, Claimant cites *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). *See also Utica Mut. Ins. Co. v. Berkoski Oil Co.,* 58 A.D.3d 717 (2d Dep't 2009); *Gryphon Dom. VI, LLC v. APP Intl. Fin. Co., B.V.*, 18 A.D.3d 286, 287 (1st Dep't. 2005) (holding that "an adverse inference may be drawn from plaintiffs' failure to produce their own account statements," which were within their own control). BurgherGray attempts to distinguish these cases because they arise under the Federal Fair Labor Standards Act. However, Respondent does not make a case why an adverse inference should not be drawn when the custodian of documents owes a non-statutory duty to maintain and produce them.

Entirely apart from any statutory obligation, I find that Respondent had a duty under the Agreement to maintain and preserve its accounting and banking records. The Agreement required Respondent to make payments to Claimant for time performed, bills sent, and moneys collected on Claimant's clients. Imbedded in that obligation was the duty to keep accurate records of those accounts

The negative inference is justified in light of the multiple examples of Respondent's inaccurate, unreliable and non-existent records.[23] In addition to the

---

[23] For example, Vivian Nguyen paid BurgherGray a $5,000 retainer for work performed by Mr. Klug and his associates. Work for this client should have been covered by that retainer although transfers from the BurgherGray trust account are not detailed in BurgherGray's production in this matter. Third Klug Affidavit ¶ 25.

deficiencies outlined at length above, Claimant also offered examples of numerous invoices where the same time was billed on multiple invoices or billed time was not included.[24] Respondent's Amended Post-Hearing brief abandoning its original position to contest giving Claimant credit for counter credits is only a further indication of how difficult it still is for Respondent to get right how much credit Claimant deserves for the work he generated and performed—even though more than 19 months have elapsed since the commencement of the arbitration, the conclusion of months of discovery, and a two day hearing on the merits.

I also find that Respondent had a separate ethical obligation, under the Rules of Professional Conduct governing attorneys in New York, to maintain accurate accounting records of client payments into the firm's trust account and client bills and payments made from that trust account. Although it is only one example, Claimant does recite how one client deposited money into the BurgherGray trust account, and BurgherGray then transferred funds from that account into its general funds to cover her bill. Strikingly, BurgherGray has chosen not to credit Mr. Klug for that payment. Evidently, BurgherGray did not account adequately whether funds were held in trust or for the benefit of the firm. *See* N.Y. Rule of

---

[24] *See, e.g.*, Email from C. Klug to B. Hurley et. al (June 8, 2021) (identifying seven clients' invoices and detailing errors found) KLUG_000219 - KLUG_000220, Email from C. Klug to M. Nieves (August 20, 2021) (explaining to M. Nieves that invoice generated in August 2021 included already billed time from 2020); Email from C. Klug to B. Hurley et. al (August 30, 2021) (notifying BurgherGray that it sent an incorrect invoice to a client despite earlier communication correcting the invoice) KLUG_000234 - KLUG_000242.

Professional Conduct 1.15(c)(3) (providing that "[a] lawyer shall . . . maintain complete records of all funds, securities, and other properties of a client or third person coming into the possession of the lawyer and render appropriate accounts to the client or third person regarding them"); D.C. Rule of Professional Conduct 1.15(a); *see In re Clower*, 831 A.2d 1030, 1034 (D.C. 2003).

I should also point out that Respondent did not comply with its obligation to produce all documents required by the discovery orders in this case. Those orders were entered without objection from either party and contemplated broad productions. For example, PHSO#1 ¶ 9 directed the parties "to exchange all discovery requested and all discovery anticipated to be required by both sides for the arbitration." Some of the unproduced invoices had clear relevance to Respondent's claim that the charges were erroneous, double booked, or not incurred. It is a fair inference that those unproduced invoices would have supported Mr. Klug's assertion of the hours entered, the hourly rates charged, and client payments collected.

Respondent next argues that Claimant is not entitled to damages because the disputed payments were not timely. Respondent incorrectly reads the Agreement to require Claimant to be employed at the time the client payments were received by BurgherGray. The pertinent language reads:

Notwithstanding anything herein to the contrary, you must be

employed by the Firm at the time any amount payable under this Section 3(c) is fully earned[4] in order to be eligible to receive such Amount.

_____

4  Meaning there is no contingency or outstanding condition other than lapse of time to the due date to which payment is subject.

Respondent urges me to consider Mr. Burgher's testimony as to the meaning to footnote 4.  Respondent argues that his testimony constitutes admissible parol evidence that explains the parties' intent when entering the Agreement. Both sides agree that parol evidence may be admitted to show the parties' intended meaning to an agreement only when the agreement is ambiguous.

I find that parol evidence is not admissible because there is no ambiguity in the Agreement. The language is clear. The provision in question states that Mr. Klug "must be employed … at the time any amount payable … is fully earned in order to be eligible to receive such Amount." (emphasis added). The clause does not say that Mr. Klug must be employed when the funds are received to get paid. The clause speaks in distinct components of time. The first component of time describes what must occur for Mr. Klug to be eligible to receive the incentive bonus. It does not state the condition that must be met for payment. The Agreement defines that Mr. Klug is "eligible to receive" a bonus if he is "employed…when the amount payable is fully earned." Respondent does not dispute that the amounts claimed derive from money that clients paid for bills that

were rendered for services that were performed. Nor does Respondent disagree that the claimed bonuses were calculated correctly in accordance with the formula in the Agreement. Nonetheless, Respondent justifies its refusal to pay Mr. Klug the bonus by interpreting "fully earned" to mean "received." It makes no sense to say that the work was only fully earned once the clients paid; otherwise, the clients would be entitled to not pay a bill on the grounds that the charge was not earned and, therefore, not due. Mr. Burgher's interpretation makes no sense and is contrary to the plain meaning of the Agreement.

Thus, the very language that Mr. Burgher recites as support for his argument supports the conclusion that once Mr. Klug fully earned the invoices he billed, he would remain eligible to receive payment despite the passage of time between performing the work and the firm receiving payment. Footnote 4 does not say that Mr. Klug will be entitled to payment only if payment is received while he remains employed. It says the opposite. Footnote 4 expressly states that but for the situation described in the first seven words, the passage of time will not bar Mr. Klug from receiving his bonus. The first seven words define the situation that would prevent payment as "[m]eaning the existence of a contingency or outstanding condition" that caused the delay in payment. In other words, even if Mr. Klug had fully performed the work, it would not be "fully earned" if a "contingency or outstanding condition" entitled the client not to pay. The most obvious example is

if the work had been performed pursuant to a retainer that contained a contingency fee that required the client to prevail before the fee was fully earned.

The acts of sending a bill and getting paid are not contingencies or conditions. Respondent pointed to no retainer agreement or invoice that contemplated additional work that needed to be done or condition or contingency that needed to be met before the amounts billed should be paid. By contrast, Mr. Klug testified that in each entry on his spreadsheet (J-2, J-3), the work had been done and was fully earned. All that remained was for the bills to be rendered and Respondent to collect, acts that naturally required time but in no sense amounted to a contingency or condition. Indeed, once a law firm renders bill, unless the client contests the amount, the billed fees are payable, and a lawyer can recover on a claim of "an account stated."

I do not accept Mr. Burgher's testimony as admissible parol evidence, in any event. Mr. Burgher's testimony sheds no light on what the parties' agreed. By his own admission, his testimony constitutes his private thoughts which he did not communicate with Claimant. (Tr. 274:4-9). In other words, his testimony represents Mr. Burgher's subjective belief about what he intended to mean when he drafted this clause in the Agreement. If anything, his testimony is an attempt to

create ambiguity when there is none in the Agreement. Cases cited by Respondent make clear that parol evidence may not be admitted to create ambiguity.[25]

Respondent also contests Claimant's entitlement to a bonus because BurgherGray claims that it did not receive the challenged fee payments that would trigger the bonus until after the calendar year when they were earned.[26] The evidence shows that BurgherGray did not impose the same timing gloss on the bonus payments when Mr. Klug was Of Counsel and partner. Instead, BurgherGray made the bonus payments to Mr. Klug after the dates required by both agreements. (SUF ¶¶ 29-30; Tr.304-312). Mr. Burgher admitted that Respondent paid Claimant in 2021 for work he had performed months earlier in the prior calendar year. In fact, it paid him the resulting bonus, with no regard to whether the client had paid in 2020 or 2021. Mr. Burgher conceded on cross-examination that payments due under the Of Counsel Agreement were not timely made. Instead of paying Mr. Klug on the last day of the month following receipt

---

[25] *See Hanam, B.V. v. Kittay*, 589 F. Supp. 1042, 1047 (S.D.N.Y. 1984) ("Parol may not be used to create an ambiguity where none exists."), cited in *Investors Ins. Co. v. Dorinco Reinsurance Co.*, 917 F.2d 100. 104 (2d Cir. 1990).

[26] The Of Counsel Agreement called for payments to be made to Mr. Klug "on or prior to the last day of the month following the month in which the Firm received payment." (Of Counsel Agreement § 3(e)). Under the Partnership Agreement, Mr. Klug was to be prorated for years in which Mr. Klug did not work all twelve months, §3(c)(i), and BurgherGray was to make payments according to the following schedule: "no later than end of the relevant calendar year §3(c); the Earned Bonus and Invoiced Work amounts were to be paid by July 31st of the year in which Mr. Klug met the Revenue Threshold by June 30 § Id.; for amounts Originated for Others, he was to be paid "on a quarterly basis no later than the last day of the month following the calendar quarter in which the related payment was received by the Firm; Id. Mr. Burgher testified that the same terms applied to the Partnership Agreement.

from a client, Mr. Burgher conceded that payments were made to Mr. Klug later than the Of Counsel Agreement and Partner Agreement required. (Tr. 308-312). Mr. Burgher testified that in early 2021, Mr. Klug had consented to these late payments but allowed that BurgherGray never received a writing confirming such an agreement or that Mr. Klug continued to consent to late payments. (Tr.316-319). Mr. Klug denied giving consent to late payment. I credit Mr. Klug's testimony.

Respondent's current position appears to be inconsistent with its practice of not paying Mr. Klug when clients paid. There is no evidence that Respondent claimed, as it does now, that payments should be segregated based on the year received. (Tr. 335). I find that BurgherGray's prior practice is more probative as to the proper interpretation of the Agreement than the self-serving position it now adopts in this litigation.

Because BurgherGray's practice of paying client receipts without regard to the Agreement's provisions respecting when the date work had been performed or when payments were received, I deem the amount owed under the Agreement was due as of December 31, 2021, for purposes of calculating prejudgment interest.

One final claim needs to be addressed. Mr. Klug claims that he is entitled to an incentive bonus under the Of Counsel Agreement for work he originated that

was performed by based on the applicable 30% schedule. For reasons that mystify, Respondent refuses to acknowledge that Claimant is entitled to the bonus.

There is no dispute as to the fact that Mr. Klug originated Charles Law Associates as a client, as to the amount of the fees generated by work for that client, or as to the applicable incentive bonus schedule. Indeed, Mr. Burgher testified that he agreed in 2020 that Mr. Klug had earned his $30,000.00 incentive bonus under the Of Counsel Agreement. (Tr. 322). Respondent nonetheless asserts that Mr. Klug's testimony on cross-examination bars him from recovery because he testified that he was fully paid under the Counsel Agreement. Respondent cites no authority for conclusion that his answer constitutes a bar or waiver. Respondent's only possible argument is that Mr. Klug's testimony constitutes an admission that he was paid.

The problem for Respondent is that BurgherGray conceded that Claimant was owed the $36,792.00 bonus for Charles Law Associates and does not now contend that it paid him the bonus. (Tr. 323-324). In fact, its records do not reflect that it did pay him. Respondent still does not claim that he was paid the bonus on the Charles River origination.

In these circumstances, I reject Respondent's position. Mr. Klug's testimony does not amount to an admission that he was paid. The cross-examination did not specify that counsel was asking if Mr. Klug had received the incentive bonus for

Charles Law Associates. (*See* Tr. 245). Indeed, the transcript contains contradictory answers as to whether Mr. Klug was saying that he had or had not been fully paid under the Of Counsel Agreement. In any event, there is no validity to the claim that Claimant waived this bonus payment; in fact, Claimant consistently asserted entitlement to the incentive award on Charles Law Associates. (Tr. 57:25-58:19). *See also* BurgherGray Opposition at 5-6; J-3, BurgherGray Client Invoices (Rows 51-55); Mr. Klug Motion for Summary Judgment at 3; Mr. Klug Post-Trial Brief at 3; Claimant Reply in Support of PFF at 9. BurgherGray may not escape its obligation to pay Mr. Klug the unpaid 2020 incentive fee that he earned.

I have considered Respondent's remaining argument and find them to be without merit. The evidence does not support its assertion that its payments in March and July 2021 were intended to settle "all amounts due and payable for 2020 and 2021." The communications between Claimant and Respondent's bookkeeper Marcia do not support the position that Mr. Klug intended or that BurgherGray understood that the payments were in exchange for releasing BurgherGray from all amounts due to Claimant as bonuses.

A.    Respondent's Counterclaim

Respondent counterclaims that Claimant owes $48,559.01 representing the two-thirds prorated share of the rent that BurgherGray paid for the premises after Mr. Klug left the firm. The relevant terms of the Agreement provide:

> You [meaning Klug] agree that if you should resign or otherwise leave your position with [BurgherGray] … prior to the expiration of any lease entered into by [BurgherGray] for DC office space within the next 6 months, you will be responsible for paying to [BurgherGray] a pro rata share (to be agreed at or prior to time of lease signing) of all rents, additional rents and other amounts due and payable by [BurgherGray] under such lease until the expiration of such lease; *provided* that, so long as the circumstances surrounding your departure are such that it is feasible and practicable for you and [BurgherGray] to peacefully co-exist in the space, you will have a right to utilize your agreed pro rata share (based upon amount paid by you relative to total amount payable by [BurgherGray]).

J-1, Partner Agreement § 20.

Claimant makes three essential arguments why he is not liable for any rent.

First, Claimant argues that Respondent is barred from enforcing the rent provision because it breached its contractual obligations to pay Claimant his incentive bonus. The cases cited by Claimant support this conclusion. *See Hartzell v Burdick*, 398 N.Y.S.2d 649, 650 (N.Y. City Ct., Oct. 12, 1977); *see also* citing *Sherry v. Federal Terra Cotta Co.*, 172 A.D. 57 (1st Dep't 1916); *Zadek v. Olds, Wortman & King*, 166 A. D. 60 (1st Dep't 1915); *Hudson River, etc. R.R. Co. v. Hanfield*, 36 A. D. 605 (3d Dep't 1899); *Melodies, Inc. v. Mirabile*, 7 A.D.2d 783 (3d Dep't 1958); *Perlman v. Israel & Sons Co.*, 306 N.Y. 254 (N.Y. 1954);

*Markham Gardens L.P. v 511 9th LLC*, 954 N.Y.S.2d 811, 815, (N.Y. Sup. Ct., Sep. 10, 2012).

Second, Claimant argues that the parties never agreed upon the pro rata share that would be owed by Mr. Klug if he left, as called for in the Agreement. The quoted term provides, in part: "[Y]ou will be responsible for paying to [BurgherGray] a pro rata share (to be agreed at or prior to time of lease signing) of all rents[.]" Claimant disputes that the two-thirds percentage is fair, in any event, because BurgherGray continued to utilize the space that previously had been occupied by Mr. Klug and his team. I agree with Claimant that the parenthetical clause was a condition precedent to Mr. Klug being responsible for a lease payment. *See Corhill Corp. v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 599 (N.Y. 1961); *Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 46, (N.Y. 1956).

Third, Claimant satisfied any obligation to mitigate when he offered to assume the lease in its entirety or share it. In fact, Respondent relies on case law that says as much. *See Tynan Incinerator Co. v. International Fidelity Ins. Co.*, 117 A.D.2d 796, 797 (2d Dep't 1986) ("Moreover, the record supports the plaintiff's claim that it made every effort to obtain a take-over contract at the lowest reasonable cost.")

The record shows that Claimant expressed a willingness, if not desire, to stay, but it was Respondent who told him to leave. On August 24, 2021, Claimant

informed BurgherGray that he intended to withdraw from the firm. Eight days later, Claimant had scouted and identified space into which it would move if Respondent did not agree that it was practicable for him to stay. Claimant wrote: "We have already located a new office location and can be out by the end of the month …". Respondent made clear that it did not believe that Claimant should stay, writing "I agree that it is not practicable under the circumstances [to cohabitate] and so you should leave." Claimant left.

Claimant says he is relieved of any responsibility under the lease because Respondent forced him out. Respondent says that it did not force Claimant out; rather, Claimant already decided to withdraw, had identified new space, and had intended to leave. Respondent mischaracterizes Claimant's decision to withdraw as a decision to leave the premises in violation of the Agreement. In addition to the email exchange, Claimant testified credibly that he was prepared to stay if Respondent had agreed.

I find that Mr. Klug offered to take over the entire lease, which would have eliminated any claimed damages for BurgherGray.  In his email of August 24, 2021, notifying BurgherGray that he would be leaving, Mr. Klug stated: "I also do not want to leave you with a DC lease and wanted to discuss how to handle the lease. We can certainly work in the same space with Claude and Renee Jones. I am fine splitting the cost of the lease in a manner that is fair, taking over the lease and

lease payment, or moving out in reasonable time." Mr. Burgher did not respond to Mr. Klug.  Mr. Klug asked again on September 2 with no response. Mr. Klug wrote a third time on September 8 and offered to coexist provided "we would need our own firm name on the door and cannot have undue restrictions in the space." Mr. Burgher responded that taking over the lease was not an option and that coexistence was not "practicable under the circumstances." He wrote that Mr. Klug "should leave".

I need not resolve whether Mr. Burgher intended to "force" Mr. Klug out or whether Mr. Burgher's words were a reaction to Mr. Klug's notice of withdrawal and conditions he placed on staying. Rather than negotiate or cite the pro rata provision in the lease, Mr. Burgher simply told Mr. King to leave.

I do not see how I can relieve Mr. Burgher of the understandable consequence of the words he chose: Mr. Burgher told Mr. Klug to leave. Mr. Klug left. Mr. Burgher was responsible.

For these reasons I dismiss the Counterclaim in its entirety.

### B.    Attorneys' Fees.

Because both sides have requested attorneys' fees, under Rule R-48(d), I am empowered to award attorneys' fees in this case.

Because Respondent is not a prevailing party, I do not award any attorneys' fees to BurgherGray.

Claimant is the prevailing party, and I award him attorneys' fees for the reasons that follow in the amount stated below.

A partnership dispute can be expected to engender honest disagreements and emotional tensions. This case is unusual in that there is no dispute that Mr. Klug performed the work, that he generated the work, that he kept track of the time that he worked, and that he created contemporaneous records of how much he earned for the firm and for himself under the terms of the Agreement. There also is no dispute that BurgherGray's records were and are in disarray, making it impossible to determine with certainty how much clients were billed, what hourly rate (or flat rate) was applied, how much was collected, when it was collected, or how much remains outstanding.

Having acknowledged its own inability to come forward with an accurate accounting of its own, BurgherGray chose to start its defense on the ground that Mr. Klug did not satisfy his burden of proving damages set forth in the contracts. I have detailed why I do not agree. What I have not set forth is the extraordinary effort the Claimant has had to undergo to establish his entitlement to the bonus payments. Some of those details are in the footnote below.[27] The effort included

---

[27]"What follows are examples of the types of complicated calculations and cross-references Claimant was forced to undertake:

Mr. Klug is entitled to reimbursement of $2,505 in client expenses that Mr. Klug paid and which BurgherGray collected from the client. Hr'g Tr. 94:17-21; 41:7-18; 19:20-21; 92:20-21; 98:3-6.

BurgherGray is entitled to offsets for the amounts that it did pay Claimant. On March 16, 2021, BurgherGray paid Mr. Klug $75,000 as incentive compensation for work performed in 2020. C-29, Combined Bank Statements at R000407; Third Klug Affidavit ¶ 32. On July 29, 2021, BurgherGray paid Mr. Klug $88,254.40 for work performed in 2020. C-29, Combined Bank Statements at R000444; Third Klug Affidavit ¶ 33. 5 In total, BurgherGray paid Mr. Klug $163,254 for work performed in 2020 under the Of Counsel Agreement and Partner Agreement. Hr'g Tr. 344:9-345:16; C-3, Email chain between Klug and Burgher (July 2021) (Mr. Burgher wrote: "See attached spreadsheet provided by Marcia covering 2020.").

Mr. Klug is entitled to credit under the Partnership Agreement for clients that he brought to BurgherGray. Mr. Klug and his associates performed and invoiced $19,071.60 worth of work for Etheim Biotics LLC while at BurgherGray. Third Klug Affidavit ¶ 21. On September 29, 2020, Etheim Biotics wired $30,000 into BurgherGray's trust account, a fact which Gopal Burgher confirmed. See Email thread between C. Klug and G. Burgher (Oct. 1, 2020) R000591. BurgherGray transferred Etheim Biotics money from the trust account to its operating account to cover the above referenced invoices as can be seen from the fact that only $8,550.90 remained in the BurgherGray trust account for Etheim Biotics when Mr. Klug left the firm. See Email thread between C. Klug and G. Burgher (Nov. 1, 2021) KLUG_000157. The ODarkor Lamptey Estate paid BurgherGray a retainer prior to Mr. Klug and his associates performing and invoicing $1,070.00 worth of work on their behalf. Work for the estate should have been covered by that retainer although transfers from the BurgherGray trust account are not detailed in BurgherGray's production in this matter. Third Klug Affidavit ¶ 23. Sponsors For Educational Opportunity paid BurgherGray a $15,000 retainer for work performed by Mr. Klug and his associates. Work for this client should have been covered by that retainer although transfers from the BurgherGray trust account are not detailed in BurgherGray's production in this matter. Third Klug Affidavit ¶ 24. Vivian Nguyen paid BurgherGray a $5,000 retainer for work performed by Mr. Klug and his associates. Work for this client should have been covered by that retainer although transfers from the BurgherGray trust account are not detailed in BurgherGray's production in this matter. Third Klug Affidavit ¶ 25.

From January 2021 through this arbitration, BurgherGray has provided various accountings purporting to capture which of Mr. Klug's invoices had paid the firm. Third Klug Affidavit ¶ 27. Mr. Klug no longer has access to all of those files because most were sent to his BurgherGray email address. Id. In one or more of those accountings the following clients' invoices were marked as paid by BurgherGray: 147 Atlantic Ave LLC, Higashi Investment LLP, Chaklader, Johny & Hilali, Zineb, The Chaklader Firm P.C., Peter & Dawn Swindells, Laura Schulz, and TCV Wealth. Id. Mr. Klug performed work for Desiree Jacobs prior to joining BurgherGray and through his own firm in the amount of $2,007. Third Klug Affidavit ¶ 28. That invoice was outstanding when Mr. Klug joined BurgherGray. Id. After joining the firm, Mr. Klug again performed work for and invoiced Ms. Jacobs for a $2,000 flat fee. Id. In 2020, Ms. Jacobs paid BurgherGray to cover both invoices. See Mobile Deposit, C-29, Combined Bank Statements at R000361 (Nov. 30, 2020); Third Klug Affidavit ¶ 28. Mr. Klug did not request the client to do this but the client thought it did not matter. Id. BurgherGray therefore should return $2,007 to Mr. Klug for work he performed prior to his joining BurgherGray and the remaining amount should be credited to him as work performed at BurgherGray. Id. The spreadsheet labeled KLUG_000245 was sent to Mr. Klug by Gopal Burgher on July 25, 2021Some of Mr. Klug's clients have historically paid, and some continue to pay now, by physical check. For example, Tarkington Northern LLC, Tony Hill, the Margaret Karageorge Estate, TCV Kunin Trust, Microbiome, and Anthony Hill and Karen Nelson all typically pay by physical check. Third Klug Affidavit ¶ 30. IX. BurgherGray's Invoicing Systems. The BurgherGray administrative team responsible for invoices repeatedly created incorrect invoices where the same time was billed on multiple invoices or billed time was not included. See, e.g., Email from C. Klug to B. Hurley et. al (June 8, 2021) (identifying seven clients' invoices and detailing errors found)

matching entries on Claimant's contemporaneous chart with banking records that do not reflect the identity of the payor, and tracing detailed explanations for work that was done and how those clients had paid in the past; sometimes even uncovering law firm records showing that Respondent previously had credited Claimant in the form of an earlier bonus for work performed and paid that Respondent now is contesting.

Equally significant, Claimant's concern with this level of detail was required through the arbitration itself, as exemplified in the footnote below.[28]

---

KLUG_000219 - KLUG_000220; Email from C. Klug to M. Nieves (August 20, 2021) (explaining to M. Nieves that invoice generated in August 2021 included already billed time from 2020); Email from C. Klug to B. Hurley et. al (August 30, 2021) (notifying BurgherGray that it sent an incorrect invoice to a client despite earlier communication correcting the invoice) KLUG_000234 - KLUG_000242. Similarly, invoices were often sent late if they were sent.  See, e.g., Email from M. Nieves to C. Klug et. al (July 1, 2021) (delaying sending June 2021's invoices until late July 2021) KLUG_000225; Email from B. Hurley to C. Klug et. al (August 26, 2021) (stating that 8 June 2021 invoices were to be verified at the end of August 2021 and that the team would start working on July 2021 invoices soon) KLUG_000232 - KLUG_000233.

[28] What follows exemplified Claimant's counsel's efforts to explicate the confusion contained in BurgherGray's accounting records:

BurgherGray cites two-time entries in support of its claim that Mr. Klug's time was charged at an hourly rate lower than the one he claims. In fact, those two entries show the depth of the problems with BurgherGray's records and production. Respondent objects to the damages sought on the Black Diamond Project for Misuho in ¶71 of Respondent's Objections on the ground that his time was billed at $627/hr. instead of $700/hr. The parties agree that Mr. Klug billed 28.8 hours, but the firm says it collected. Claimant's exhibit J-3 recites the firm collected $25,293.37. Respondent's assertion is premised invoice: INV-000983, but BurgherGray did not produce that invoice.

Similarly, ¶ 79 of R.Obj. asserts that Mr. King performed only 27.3 hours of work for JP Morgan Chase at $638/hr., while Mr. Klug testified, he did $40,000 worth of work. Notably, BurgherGray admits that it collected more than 100% of what Mr. Klug claimed: $43,409.00, but it cites invoice, INV-001291without producing it BurgherGray also contests Claimants damages on the ground that it charged five clients a flat fee instead of the hours, even though Mr. Klug recorded the hourly rate. ¶60 now asserts that BurgherGray cannot find Mr. Klug's time in its system and that it actually charged a flat fee.

Respondent also had its principal testify to his personal understanding of the meaning of contractual language that he had drafted under the guise of parol evidence. However, in response to my questions, he acknowledged that he never discussed the meaning he attributed to his words with Mr. Klug. As explained above, the plain meaning of the contract does not support Mr. Burgher's

---

¶ 60 relates to work that Mr. Klug did in 2020, work and a client payment which BurgherGray confirmed in 2021 and for which it paid Mr. Klug based on his hourly calculations. Post hearing, BurgherGray for the first time claimed it could not find Mr. Klug's time in its system and that it actually charged a flat fee. BurgherGray also claims it charged a flat fee for clients in ¶¶ 74, 75, 76, and 78 R. Obj. In these paragraphs Respondent's counsel "testifies," for the first time, that BurgherGray calculated Mr. Klug's incentive compensation but provides no citation to any agreement, formula, or any evidence. In each instance, BurgherGray cites to an invoice – INV-001313, INV-001053, INV-001099 – but it produced none of these invoices.

Respondent also objected in R.Obj. ¶¶76,78 that Mr. Klug was owed $5,936 and $224 even though Claimant discovered that those are the same amounts that Mr. Klug had claimed based on hourly calculations.

In ¶55 of R. Obj., BurgherGray asserted that it could not find Mr. Klug's time even though, in 2021, BurgherGray had confirmed that same time and had paid him for it.
In ¶ 73 of R.s Obj., BurgherGray admitted that it had collected $91,087.56 but objected to an entry by Mr. King of an additional 0.8 hours totaling $224 because it did not find that entry in its system.
BurgherGray claims it could not find two matters in its system even though Respondent had paid Claimant for his work. (See ¶ R. Obj. 52 Mr. Klug.

In ¶ 67 of R. Ob., BurgherGray claims it could not find a matter for client RMS named "Phantom Equity Plan." However, BurgherGray admitted there were 35 matters in its system for RMS, but did not produce that list or the related invoices.

BurgherGray next claims that Mr. Klug had "duplicate line items which [Mr.] Klug treated as separate matters." Mr. Burgher and the firm's accounting manager previously had recognized the validity and distinction between four of these matters, and they paid Mr. Klug for this work BurgherGray claims without evidence that Mr. Klug's three entries for Harpia are duplicates. But line items 36 and 38 reflect 55.3 and 1.9 hours in April and May 2021, respectively, that Mr. Klug performed for Harpia in addition to the 33 hours that he performed in February in line item 33. Importantly, BurgherGray identifies at least three invoices related to this work: INV-001716, INV-001711, and INV-001712 and $77,758.65 in client payments. But BurgherGray failed to produce these invoices.

explanation, and the parties behaved in ways contrary to what Respondent claims the contracts mean.

By contrast, I credit Mr. Klug's testimony that he caused a client to pay $143,000 to BurgherGray after his departure from the firm. The fact that he did this despite the disagreement over amounts due undermines Respondent's contention that Mr. Klug is to blame for BurgherGray not collecting overdue amounts. Indeed, Mr. Burgher never told Mr. Klug whether clients were billed, whether the billed contained a discount or flat fee, whether the clients had paid, or how much was outstanding. Mr. Klug's conduct in obtaining the $35,000.00 collection after his departure from the firm leaves little doubt that he would have caused BurgherGray to collect the amounts it now says it has no record of being paid.

The point is that it would be unfair in these circumstances to require Claimant to bear the cost of this prolonged proceeding, detailing each client, each matter and the status of each invoice.

That said, I note that some of Claimant's efforts were unnecessary and diverted the parties and Tribunal from concluding the matter more efficiently. For example, Claimant insisted on proceeding by summary judgment despite my repeated urging that the parties go straight to a hearing, because it was apparent to me that Respondent would not stipulate to material facts if, for no other reason,

Respondent did not have possession of the records showing the amounts that Claimant sought. Indeed, I granted permission to proceed by summary judgment on the condition that the parties reach agreement as to the material issues of fact not in dispute and those that would need to be tried.

I also must account for the time that Claimant spent on his unsuccessful and belated attempt to obtain treble damages under the D.C. Wage Act. Claimant spent considerable time in his Post-Hearing brief arguing that I manifestly disregarded the law. This is a frivolous argument because the record is clear that I considered his arguments but did not permit him to file the claim for reasons set forth above.

Claimant's post-hearing brief does not contain sufficient detail to allow me to assess the reasonableness of Claimant's request for $199,306.00 in fees, or how much of his time was spent on matters which properly should be written off or discounted. In these circumstances, I believe that it is appropriate to award Claimant a substantial portion of the attorneys' fees requested, but that some meaningful discount is in order. I find that an award of $140,000.00 is a reasonable sum under the circumstances described above.[29]

**IX. COSTS**

---

[29] I also note that $140,000 is slightly higher, but in line, if this case had been taken on a contingency fee at 33% of the $406,000 awarded.

For the same reasons, I award Claimant the costs of these proceedings as determined by the AAA in the amount noted below.

## X. **Final Award**

Upon careful consideration of the evidentiary record and the parties' respective positions and submissions, I find and award as follows:

1. As to Mr. Klug's claim that BurgherGray breached the Partnership Agreement, I find in favor of Mr. Klug and direct that Mr. Klug recover from BurgherGray:

    a) The sum of $406,098.96 in Damages, plus prejudgment interest at New York prejudgment interest rates at 9% from January 1, 2022 until the award is paid in full.

    b) Unreimbursed Expenses in the amount of $2,505.50

    c) Mr. Klug is further awarded attorneys' fees, of this proceeding in the amount of $140,000.00.

    d) As to BurgherGray's counterclaim, I find in Mr. Klug's favor and direct that BurgherGray not recover any damages from Mr. Klug.

    e) The administrative fees of the AAA, totaling Nine Thousand, Nine-Hundred and Seventy-Five Dollars ($9,975.00), and the compensation of the arbitrator totaling One Hundred and One Thousand, Two Hundred Dollars ($101,200.00) shall be borne by BurgherGray. Therefore, BurgherGray shall reimburse Mr. Klug the sum of $58,850.50 Dollars (Fifty-eight thousand eight hundred dollars and 50 cents), representing that portion of said fees previously incurred by Mr. Klug upon demonstration by Claimant that these fees have been paid.

The above sums are to be paid on or before 20 days from the date of this Award.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

_November 25, 2024_
Date:

John S. Siffert

I, John S. Siffert, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the Final Award of the Arbitrator.

_November 25, 2004_
Date:

John S. Siffert